[Cite as *State v. Ramirez*, 2019-Ohio-4591.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-981 |
| | | (C.P.C. No. 17CR-6934) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Rigoberto Ramirez, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 7, 2019

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief**: *Kura, Wilford & Schregardus Co., L.P.A.*, and *Sarah M. Schregardus*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Rigoberto Ramirez, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of felonious assault and having weapons while under disability.

{¶ 2} On December 26, 2017, appellant was indicted on two counts of felonious assault, in violation of R.C. 2903.11, and one count of having weapons while under disability, in violation of R.C. 2923.13. Count 1 named Stefan Thompson as the victim, while Count 2 named Charles Ooten as the victim.

{¶ 3}   The matter came for trial before a jury beginning October 29, 2018.  The first witness for the state, Jessica Hupp, resides at the corner of Floral and Belvidere Avenues in the "Hilltop" area of Columbus.  (Oct. 30, 2018 Tr. Vol. II at 37.)   Hupp's house is located near Wrexham Park.

{¶ 4}   On November 14, 2017, an African-American male knocked on the front door of Hupp's residence and told her: "Please, I got shot.  I need you to call 911."    Hupp observed the man was bleeding.  She called 911 and "told them I had somebody at my front door who was holding his arm and said he had been shot."  (Oct. 30, 2018 Tr. Vol. II at 42.)  As Hupp was making the call, the man ran off the porch, "down the sidewalk, and then up the alley."  (Oct. 30, 2018 Tr. Vol. II at 52.)  At trial, plaintiff-appellee, State of Ohio, played a recording of the 911 call made by Hupp.

{¶ 5}   Later that day, at 5:42 p.m., Columbus Police Officer Mary Ann Clouse was dispatched to Wrexham Avenue following a report of a shooting.  Officer Clouse arrived at a residence on Wrexham Avenue and spoke to Mills.  Mills "gave an account of an altercation that occurred in his front yard area" that evening.  (Oct. 30, 2018 Tr. Vol. II at 69.)  Officer Clouse relayed the information she obtained to a detective.

{¶ 6}   On November 14, 2017, at 5:42 p.m., Columbus Police Officer Shannon J. Dearwester was dispatched to an address on Floral Avenue following a report of a shooting.   Officer Dearwester did not see anyone at the address.   Police officers subsequently found a shooting victim on Wrexham Avenue.  The officers approached him, "found blood on the steps where he was laying, and he told us that he * * * had been shot." The shooting victim was "in his mid 20s, African-American gentleman." The victim "pointed out that he was shot in one of his legs. * * * And he had another gunshot near his arm maybe, by his wrist or his hand."  (Oct. 30, 2018 Tr. Vol. II at 80.)  Officer Dearwester asked the man who shot him, but "he wouldn't give me a name or anything of that nature."  (Oct. 30, 2018 Tr. Vol. II at 82.)

{¶ 7}   On November 14, 2017, Columbus Police Officer Ryan Erney and his partner, Officer Seth Gamby, were dispatched to the emergency room at Grant Hospital. They initially met with Samantha Ooten, the wife of a shooting victim.  Officer Erney then met with the shooting victim, Charles P. Ooten, Jr., who told the officer "he was walking to a cornerstore in the area of Wrexham Park, heard some gunshots, and realized that he

was shot." (Oct. 30, 2018 Tr. Vol. II at 110.) Ooten provided no further information regarding the shooting. The officer learned that Ooten's wife had driven him to the hospital.

{¶ 8} Ooten, age 25, resides on the west side of Columbus. During the events at issue, Ooten was staying at the home of his cousin, Joshua Mills, whose residence is located on Wrexham Avenue.

{¶ 9} On November 14, 2017, at approximately 4:00 p.m., Ooten was at Mills' house on Wrexham Avenue. Mills was on the front porch "with multiple people." (Oct. 30, 2018 Tr. Vol. II at 127.) Ooten identified some of the individuals, including "Justin and Josh," and "a guy named Marty." He also recalled "a young boy named Joey and his mother." Ooten stated there were approximately ten individuals on the porch "arguing." (Oct. 30, 2018 Tr. Vol. II at 128.)

{¶ 10} Ooten testified that appellant arrived at Mills' residence as a passenger in a white Lexus; the vehicle came from the direction of Floral Avenue. Appellant exited the vehicle while the driver remained inside. At the time, Ooten was standing outside leaning against a vehicle. Another individual, Thompson, also arrived at the residence. Ooten testified that "Josh and Justin were on the porch; and Joey, [and] his mother were in the yard screaming up at the porch; and there was a lot more going on." (Oct. 30, 2018 Tr. Vol. II at 129.) Appellant "was trying to get Josh to come out to the street to fight." Appellant was also arguing with "Bernie." Appellant "was trying to get someone to come out to the street, but he was also wielding a gun at the time." (Oct. 30, 2018 Tr. Vol. II at 133.) Ooten observed appellant obtain the weapon from the driver's side of the vehicle. Ooten testified that no one else had a weapon.

{¶ 11} A fight broke out on the porch "between * * * Marty and Justin; and Josh was trying to keep everybody off the porch." Appellant then "jumped up onto the porch" and hit Ooten's cousin, Bernie Hickman, in the face. (Oct. 30, 2018 Tr. Vol. II at 130.) Appellant then "hopped back down, and revealed a weapon from his pocket." (Oct. 30, 2018 Tr. Vol. II at 136.) After appellant punched Hickman, Ooten removed his hoodie and "swung" at appellant, making "contact with the back of [appellant's] head." (Oct. 30, 2018 Tr. Vol. II at 137.)

{¶ 12} Appellant "seemed dazed for a second," and "he bumped into Stefan and came out of the daze." Ooten testified appellant then "turned and looked at me and said, 'You have the balls to swing on me?' And then he fired the gun at me." (Oct. 30, 2018 Tr. Vol. II at 137.) Ooten stated appellant "proceeded to shoot at me four times, once hitting me in the leg; and then he turned the gun to Stefan and shot him and chased him around the side of the house, on the porch side." Ooten observed appellant shoot at Stefan "one time, and then he disappeared on the other side of the house." (Oct. 30, 2018 Tr. Vol. II at 138.) Appellant "came back around after the gun was empty, ran back behind the house, and into the alley and proceeded to hop into the white Lexus." (Oct. 30, 2018 Tr. Vol. II at 139.) Ooten heard between eight to ten shots fired that evening.

{¶ 13} After being shot, Ooten walked to a residence on Vanderberg Avenue where his wife was staying. Ooten did not remain at the scene of the shooting because he "had warrants." (Oct. 30, 2018 Tr. Vol. II at 141.) Ooten's wife drove him to Grant Hospital. Police officers spoke with him at the hospital. Ooten testified that, at first, he did not tell the truth about the events because he "didn't want to get anybody in trouble." (Oct. 30, 2018 Tr. Vol. II at 145.) Ooten initially told an officer "I was walking through the park, where I heard about eight shots ring out, and caught a stray bullet." (Oct. 30, 2018 Tr. Vol. II at 145-46.) Ooten eventually told police detectives the truth.

{¶ 14} During the events, Ooten suffered a gunshot wound to his leg, below the knee; the bullet passed through his leg. The wound took approximately three weeks to heal, and Ooten still walks with a limp as a result of the injury.

{¶ 15} Columbus Police Officer Richard D. Criner, a member of the department's crime scene search unit, took photographs at the Wrexham Avenue residence. Officer Criner stated no shell casings or projectiles were found at the scene. At trial, Officer Criner also identified photographs taken at a porch located on Floral Avenue. The officer noted there was "blood on the porch and a couple drops of blood on the walkway going up to the front porch." (Oct. 30, 2018 Tr. Vol. II at 198.)

{¶ 16} Mills testified he resides on Wrexham Avenue, Columbus. On November 14, 2017, Thompson, a friend of Mills, arrived at Mills' residence at approximately 5:30 p.m. Ooten had been at Mills' residence all day. Ooten is related to Mills "through marriage." (Oct. 30, 2018 Tr. Vol. II at 219.) During his testimony, Mills referred to Ooten as "P.J."

(Oct. 30, 2018 Tr. Vol. II at 216.)   Other individuals at Mills' residence that evening included Hickman, Johnny Haynes, Karen Haynes, Rena Dodson, Justin Hodge, Christopher Raymond, and Katie Hillberry.

{¶ 17} Mills testified that Hickman owed an individual $300, and that appellant and an individual named "Joey" came to his residence that evening with weapons. Appellant arrived as a passenger in a white SUV.  Mills stated Joey was wearing a bullet proof vest and had "a .380," while appellant had "a .25."  (Oct. 30, 2018 Tr. Vol. II at 224.)

{¶ 18} Appellant came up to the porch and "sucker punched Bernie in the side of his face, and then stepped down."  (Oct. 30, 2018 Tr. Vol. II at 236.)  As soon as appellant stepped down, Ooten "came from this area, hit him, but slipped, didn't hit him with a full connect."  (Oct. 30, 2018 Tr. Vol. II at 237.)  Appellant "reached out as he was falling" and fired his weapon, hitting Ooten in the leg.  Appellant then "went after Stef."  (Oct. 30, 2018 Tr. Vol. II at 237, 234.)  Mills testified that Thompson "circled around my car, took off running, and pow, pow."  From the back alley "you hear pow, pow, pow."  Appellant "ran out of bullets," and then ran to the white SUV "that picked him up in the back alley and took off."  (Oct. 30, 2018 Tr. Vol. II at 237.)  Mills testified that appellant was the only individual who fired shots that evening.

{¶ 19} Officers interviewed Mills after the incident and Mills informed them an individual named "Junior" had loaned money to Hickman.  (Oct. 30, 2018 Tr. Vol. II at 262.)  Mills told police he witnessed appellant shoot both Ooten and Thompson.

{¶ 20} On December 7, 2017, Mills spoke with detectives who showed him a photographic array.  Mills signed a statement in which he circled a photograph on the array and wrote: "He shot my best friend twice and shot my cousin once in his leg." (Oct. 30, 2018 Tr. Vol. II at 242.)

{¶ 21} On December 7, 2017, Columbus Police Detective Kenneth L. Trivette, while acting in the capacity of a "blind administrator," prepared a photographic array.  (Oct. 31, 2018 Tr. Vol. III at 289.)  The detective showed the array to Mills, and Mills selected the individual in position No. 3.  Detective Trivette testified the individual depicted in position No. 3 was appellant.

{¶ 22} Following the presentation of testimony, the parties entered stipulations into the record, including stipulations that: (1) state's exhibit Z-1 was a certified copy of an

indictment, dated June 20, 2016, charging appellant with aggravated burglary, domestic violence, and having weapons while under disability, (2) state's exhibit Z-2 was a certified copy of a judgment entry, dated May 7, 2014, finding appellant a delinquent minor for committing the offense of trafficking in drugs, and (3) state's exhibit Z-3 was a certified copy of a judgment entry, dated May 7, 2014, finding appellant a delinquent minor for committing the offense of attempted burglary. The parties further stipulated that aggravated burglary, domestic violence, and attempted burglary are offenses of violence, and that trafficking in drugs is an offense involving illegal use, possession, sale, administration, distribution or trafficking in any drug of abuse.

{¶ 23} Following deliberations, the jury returned verdicts finding appellant not guilty of felonious assault as charged in Count 1 (victim Thompson), but guilty of felonious assault as charged in Count 2 (victim Ooten), as well as the specification to that count, and guilty of having weapons while under disability as charged in Count 3. By judgment entry filed November 28, 2018, the trial court sentenced appellant to 3 years incarceration on Count 2, and 12 months as to Count 3, with the sentences to be served concurrently to each other, but consecutive to a sentence of 36 months on the firearm specification in Count 2.

{¶ 24} On appeal, appellant sets forth the following two assignments of error for this court's review:

> ASSIGNMENT OF ERROR I
>
> The trial court violated Rigoberto Ramirez' rights to due process and a fair trial when it entered a judgment of conviction for Felonious Assault and Having a Weapon While Under Disability, when the judgments were against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.
>
> ASSIGNMENT OF ERROR II
>
> The trial court erred when it improperly imposed Post-Release Control.

{¶ 25} Under his first assignment of error, appellant challenges his convictions as against the manifest weight of the evidence. Asserting there were no weapons recovered

or other physical evidence found at the scene, appellant maintains the state's evidence consisted solely of testimony by "biased witnesses who could not keep their stories straight." (Appellant's Brief at 10.)

{¶ 26} In considering whether a conviction is against the manifest weight of the evidence, an appellate court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 27} As noted, the jury returned verdicts finding appellant guilty of felonious assault (with respect to Ooten), and having weapons while under disability. R.C. 2903.11(A)(2) defines the offense of felonious assault in part as follows: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2923.13 sets forth the offense of having weapons while under disability, and R.C. 2923.13(A)(2) states in part: "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence."

{¶ 28} At trial, Ooten testified he was at the home of Mills, located on Wrexham Avenue, on the evening of November 14, 2017. According to Ooten, approximately ten individuals were at the residence, and an argument ensued. Appellant arrived as a passenger in a white Lexus SUV and had a weapon which he obtained from the driver's side of the vehicle. Ooten testified that appellant jumped up onto the porch and struck Hickman in the face; when appellant jumped back down from the porch, Ooten swung at appellant, making contact with the back of his head. Appellant seemed dazed at first, but then fired four shots at Ooten, with one of the shots hitting Ooten in the leg. Appellant then turned the weapon on Thompson, chasing him around the side of the house. After emptying his weapon, appellant ran back to the white SUV and left the scene. Ooten testified that the bullet fired by appellant passed through his leg, below the knee, leaving a scar and causing him to walk with a slight limp.

{¶ 29} Mills testified that a number of individuals were at his residence on the evening of November 14, 2017.  According to Mills, Hickman owed someone $300, and appellant and another individual (Joey) came to his residence with weapons.  Appellant, who arrived in a white SUV, came up to the porch and "sucker punched" Hickman in the side of the face.  (Oct. 30, 2018 Tr. Vol. II at 236.)  When appellant stepped down from the porch, Ooten came up and hit appellant; Ooten, however, had "slipped," and he "didn't hit [appellant] with a full connect."  (Oct. 30, 2018 Tr. Vol. II at 237.)  Appellant turned and fired his weapon at Ooten, hitting him in the leg.  Appellant then "went after" Thompson. (Oct. 30, 2018 Tr. Vol. II at 234.)  Thompson took off running and appellant chased him, firing at him in the direction of a nearby alley.  Mills testified appellant was the only individual to fire a weapon that evening.

{¶ 30} Appellant maintains the state's witnesses were not credible, and asserts Ooten changed his story regarding the events.  However, "[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial."  *State v. Hudson,* 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 12, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.  In this respect, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony."  *Id.,* citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257.  Further, "[t]he trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible."  *Id.*

{¶ 31} In the present case, Ooten testified he initially lied to officers (in relating he caught a stray bullet while walking through a park) because he had warrants at the time of the shooting and "didn't want to talk to the police or anybody else about it."  (Oct. 30, 2018 Tr. Vol. II at 141.)  While stating he "told an incorrect story to the police the first time to protect myself and others," Ooten testified he subsequently told police investigators what actually happened.  (Oct. 30, 2018 Tr. Vol. II at 159.)  As the trier of fact, the jury was free to accept or reject that testimony.  Further, the testimony of Mills and Ooten was generally consistent as to the primary events of November 14, 2017.  Both witnesses testified as to appellant striking an individual (Hickman) on the porch of Mills' residence, prompting Ooten to swing at appellant.  Both witnesses also related that

appellant fired his weapon at Ooten, hitting him in the leg, and that appellant then turned the weapon on another individual (Thompson) before fleeing the scene in a white vehicle.

{¶ 32} Appellant also cites the lack of physical evidence from the crime scene, including the fact no shell casings were found. The state's theory of the case, however, which the jury was free to consider, was that appellant fired the shots from a revolver (which would not have ejected shell casings).

{¶ 33} Under Ohio law, "a lack of physical evidence alone does not render a conviction against the manifest weight of the evidence." *State v. Conner,* 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. In the instant case, the testimony of both Ooten and Mills, if believed, directly identified appellant as the shooter. *See State v. Jackson,* 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 15 (physical evidence was not needed to link the appellant to the crime because testimony of witness asserted the appellant was the perpetrator); *State v. Lundy,* 8th Dist. No. 90229, 2008-Ohio-3359, ¶ 12 (lack of physical evidence did not render convictions against the manifest weight of the evidence; "[p]hysical evidence merely would have bolstered the direct testimony of the state's witnesses").

{¶ 34} Here, the state presented sufficient evidence which, if believed, supported the elements of felonious assault beyond a reasonable doubt. Regarding the conviction for having weapons under disability, appellant stipulated at trial to prior felony offenses demonstrating disability which, in addition to the evidence presented at trial, was sufficient to support his conviction on that count. On review of the record, we cannot conclude the trier of fact lost its way and committed a manifest miscarriage of justice in convicting appellant of felonious assault and having weapons while under disability. The verdicts, therefore, are not against the manifest weight of the evidence.

{¶ 35} Accordingly, the first assignment of error is not well-taken and is overruled.

{¶ 36} Under the second assignment of error, appellant notes he was convicted of a second-degree felony, subject to three years of post-release control, and that the trial court informed him at the sentencing hearing he would be subject to a mandatory three-year period of post-release control. Appellant further argues, however, the sentencing entry imposed a mandatory period of up to five years.

{¶ 37} In response, the state, while noting the trial court announced the correct term of post-release control (i.e., three years) at the sentencing hearing, concedes the trial court's judgment entry states an incorrect term of five years of post-release control. The state further argues the mistake is a clerical error that should be corrected through a nunc pro tunc entry. We agree.

{¶ 38} The record indicates the trial court, at the sentencing hearing, advised appellant "that upon your release, you're going to have a mandatory three-year period of post-release control." (Nov. 26, 2018 Tr. at 17.) Thus, appellant received the proper oral advisement of post-release control. However, the trial court's judgment entry of conviction and sentence states the trial court notified appellant that he "**will** receive a period of post-release control of up to **Five (5) Years, mandatory**." (Emphasis sic.)

{¶ 39} Under Ohio law, "the trial court is authorized to correct a mistake in the sentencing entry by nunc pro tunc entry without holding a new sentencing hearing when a defendant is notified of the proper term of post-release control at the sentencing hearing and the error is merely clerical in nature." *State v. Smalls*, 5th Dist. No. 2013CA00086, 2013-Ohio-5674, ¶ 18, citing *State ex rel. Womack v. Marsh*, 128 Ohio St.3d 303, 2011-Ohio-229, ¶ 14.

{¶ 40} Here, because the trial court's judgment entry contains a clerical mistake, we partially sustain appellant's second assignment of error and remand this matter to the trial court for the limited purpose of issuing a nunc pro tunc entry correcting the sentencing entry to conform to the mandatory post-release control term of three years as indicated by the trial court at the sentencing hearing.

{¶ 41} Based on the foregoing, appellant's first assignment of error is overruled, appellant's second assignment of error is sustained in part, and otherwise overruled, the judgment of conviction entered by the Franklin County Court of Common Pleas is affirmed, and this matter is remanded to the trial court for the limited purpose of issuing a nunc pro tunc entry correcting the sentencing entry.

*Judgment affirmed and cause remanded.*

KLATT, P.J., and BEATTY BLUNT, J., concur.

_____